# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## No. 23-15601

### COMET TECHNOLOGIES USA, INC., A DELAWARE CORPORATION; ET AL.,

*Plaintiffs-Appellees*,

v.

### XP POWER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,

*Defendant-Appellant*.

## No. 23-15709

### COMET TECHNOLOGIES USA, INC., A DELAWARE CORPORATION; ET AL.,

*Plaintiffs-Appellants*,

v.

### XP POWER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,

*Defendant-Appellee*.

Appeals from the United States District Court
for the Northern District of California
No. 5:20-cv-6408-NC (Nathanael M. Cousins, Magistrate Judge)

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## XP POWER LLC

### REDACTED

Patricia Young
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Michael E. Bern
  *Counsel of Record*
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

August 30, 2023

*Counsel for Defendant-Appellant XP Power LLC*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant XP Power LLC is indirectly owned by XP Power Ltd.

No publicly held corporation owns 10% or more of XP Power Ltd.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..........................................................................v

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION...................................................................4

STATEMENT OF THE ISSUES........................................................................4

STATUTORY AUTHORITIES ........................................................................5

STATEMENT OF THE CASE ..........................................................................5

    A.    Factual Background...................................................................5

        1.    XP Hired Former Comet Employees Whom, Unbeknownst To XP, Retained Comet Documents After Leaving Comet. ...............................................................5

        2.    Once Informed Of Comet's Concerns, XP Immediately Quarantined The Employees' Storage Devices. .......................6

        3.    Despite Initially Suing Only Its Former Employees, Comet Turned Its Sights On XP's Deeper Pockets. ..................7

    B.    Procedural Background ..............................................................7

        1.    During Discovery, XP Learned That Mason Had Transferred Numerous Documents From Advanced Energy To Comet, Including Documents Alleged To Be Comet's Trade Secrets. ...............................................................7

        2.    The District Court Barred XP From Using Evidence That Showed Comet's Purported Trade Secrets Were Owned By Advanced Energy. ................................................................10

        3.    Comet Sought Unjust Enrichment Damages Based On Allegedly Avoided Development Costs For Future Products.......................................................................................12

4.      The District Court Awarded XP Judgment On Trade
        Secret T. ........................................................................ 13

5.      The District Court Improperly Instructed The Jury,
        Converting An Element Of Comet's Claims Into An
        Affirmative Defense, Over Both Parties' Objections. ............. 13

6.      The Jury Awarded More Damages For Trade Secrets D
        And E Than The Evidence Supported. .................................... 15

7.      The District Court Entered Duplicative Relief In The Form
        Of A Permanent Injunction. .................................................. 16

8.      The District Court Denied XP's Post-Trial Motions. .............. 17

SUMMARY OF ARGUMENT ................................................................ 18

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT ........................................................................................ 22

I.      THE DISTRICT COURT'S ERRONEOUS REVERSAL OF THE
        BURDEN OF PROOF IN ITS FINAL JURY INSTRUCTIONS
        NECESSITATES REVERSAL. ..................................................... 22

        A.      The Instruction Erroneously Reversed The Burden of Proof,
                Despite XP's Timely Objection. ......................................... 22

        B.      The Erroneous Instruction Necessitates Reversal. ............... 23

II.     THE DISTRICT COURT IMPROPERLY EXCLUDED EVIDENCE
        RELEVANT TO OWNERSHIP OF TRADE SECRETS D AND E ........... 27

        A.      The District Court Improperly Excluded Evidence That Comet
                Did Not Own Key Components Of Trade Secrets D And E .............. 28

        B.      Comet Cannot Rebut The Presumption of Prejudice. ......................... 37

III.    THE DISTRICT COURT'S DENIAL OF XP'S MOTION FOR A
        NEW TRIAL OR REMITTITUR CANNOT BE SQUARED WITH
        COMET'S OWN TRIAL EVIDENCE OR THE JURY'S SPECIAL
        VERDICT. .............................................................................. 40

A.  The Jury's Compensatory Damages Award Was Clearly Not Supported By The Evidence, And Was Arbitrary And Speculative. ........................................................41

  1.  Comet's Evidence Does Not Support The Jury's $20 Million Award. ...........................................................41

  2.  The Jury Awarded An Amount Far Exceeding Anything Supported By The Trial Evidence. ...........................................42

C.  The District Court's Reasons For Rejecting XP's Motion For Remittitur Do Not Withstand Scrutiny. ...............................................44

D.  Because The Jury's Compensatory Damages Award Must Be Reduced, The Jury's Punitive Damages Award Must Be Reduced As Well. ........................................................49

IV.  THE DISTRICT COURT IMPROPERLY ALLOWED DOUBLE RECOVERY. ........................................................51

  A.  The Law Prohibits Double Recovery. .................................................51

  B.  The Jury's Award Of Unjust Enrichment Damages And The Court's Permanent Injunction Constitute Double Recovery. ...........54

  C.  The District Court's And Comet's Arguments To The Contrary Are Unpersuasive. ........................................................57

CONCLUSION ........................................................60

STATEMENT OF RELATED CASES ..............................................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aguilar v. City of Los Angeles*,
853 F. App'x 92 (9th Cir. 2021) ..........................................................28

*Allied Erecting & Dismantling Co. v. Genesis Equipment & Manufacturing*,
511 F. App'x 398 (6th Cir. 2013) .......................................................53

*Allied Erecting & Dismantling Co. v. Genesis Equipment & Manufacturing*,
805 F.3d 701 (6th Cir. 2015) .......................................................53, 54

*Barranco v. 3D Systems Corp.*,
952 F.3d 1122 (9th Cir. 2020) ............................................................21

*BladeRoom Group Ltd. v. Emerson Electric Co.*,
20 F.4th 1231 (9th Cir. 2021) ..........................................23, 24, 25, 27

*Boles Trucking, Inc. v. United States*,
77 F.3d 236 (8th Cir. 1996) ................................................................24

*Care Services Management, LLC v. Premier Mobile Dentistry of VA, LLC*,
No. 17-cv-01095, 2020 WL 5797974 (M.D. Tenn. Sept. 29, 2020) .................23

*Carvalho v. Raybestos-Manhattan, Inc.*,
794 F.2d 454 (9th Cir. 1986) ...................................2, 19, 22, 24, 25

*ClearOne Communication, Inc. v. Bowers*,
643 F.3d 735 (10th Cir. 2011) ......................................................58, 59

*Clem v. Lomeli*,
566 F.3d 1177 (9th Cir. 2009) ......................................................passim

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ...................................21, 22, 23, 24, 27

*DSC Communications Corp. v. Next Level Communications*,
107 F.3d 322 (5th Cir. 1997) ..............................................................53

v

**Page(s)**

*E.I. DuPont De Nemours & Co. v. Kolon Industries, Inc.*,
    564 F. App'x 710 (4th Cir. 2014) ........................................................36

*Epic Systems Corp. v. Tata Consultancy Services Ltd.*,
    980 F.3d 1117 (7th Cir. 2020) ............................................................49

*Gametech International Inc. v. Trend Gaming Systems, L.L.C.*,
    232 F. App'x 676 (9th Cir. 2007) ..................................................27, 28

*General Telephone Co. of the Northwest, Inc. v. Equal Employment
    Opportunity Commission*,
    446 U.S. 318 (1980)............................................................................51

*Hatami v. Kia Motors America, Inc.*,
    No. SACV 08-226, 2010 WL 11475044 (C.D. Cal. July 7, 2010)....................47

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance
    Mortgage Co.)*,
    471 F.3d 977 (9th Cir. 2006) ..................................................21, 41, 48

*Home Pride Foods, Inc. v. Johnson*,
    634 N.W.2d 774 (Neb. 2001) ........................................................53, 57

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) ..............................................................22

*January v. Dr Pepper Snapple Group, Inc.*,
    594 F. App'x 907 (9th Cir. 2014) .......................................................28

*Jerden v. Amstutz*,
    430 F.3d 1231 (9th Cir. 2006) ............................................................28

*Kellwood Apparel, LLC v. Protrend Ltd.*,
    No. CV 20-214, 2020 WL 13302669 (C.D. Cal. Mar. 5, 2020)........................26

*Martinez v. Barr*,
    941 F.3d 907 (9th Cir. 2019) ................................................................4

*Medimpact Healthcare Systems, Inc. v. IQVIA Holdings Inc.*,
    No. 19cv1865, 2022 WL 1571000 (S.D. Cal. May 17, 2022)............................23

**Page(s)**

*Next Level Communications LP v. DSC Communications Corp.*,
179 F.3d 244 (5th Cir. 1999) ...............................................................53

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ....................................19, 21, 27, 28, 37

*Olaplex, Inc. v. L'Oréal USA, Inc.*,
855 F. App'x 701 (Fed. Cir. 2021) ....................................................26

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014) ............................................................43

*Pacific Northwest Solar, LLC v. Northwestern Corp.*,
Nos. 22-35186, 22-35224, 2023 WL 2945314 (9th Cir.
Apr. 14, 2023) .....................................................................................28

*Payne v. Jones*,
711 F.3d 85 (2d Cir. 2013) .................................................................49

*Seymour v. Summa Vista Cinema, Inc.*,
809 F.2d 1385 (9th Cir. 1987) ......................................................43, 44

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ..............................................................41

*Snyder v. Freight, Construction, General Drivers, Warehousemen
& Helpers, Local No. 287*,
175 F.3d 680 (9th Cir. 1999) ..................................................41, 44, 48

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ......................................................................49, 59

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
No. 16cv545, 2018 WL 6272893 (E.D. Va. Nov. 30, 2018) .............58

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*,
No. 15 Civ.211, 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021),
*aff'd in part and rev'd in part on other grounds*, 68 F.4th 792
(2d Cir. 2023) .....................................................................................50

**Page(s)**

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*,
  68 F.4th 792 (2d Cir. 2023) ..........................................................*passim*

*Teutscher v. Woodson*,
  835 F.3d 936 (9th Cir. 2016) ......................................................21, 52

*United States v. Bailleaux*,
  685 F.2d 1105 (9th Cir. 1982) ............................................................35

*United States v. Bajoghli*,
  785 F.3d 957 (4th Cir. 2015) ..............................................................34

*United States v. Bryan*,
  719 F. App'x 695 (9th Cir. 2018) .......................................................34

*United States v. McFall*,
  558 F.3d 951 (9th Cir. 2009) ..............................................................34

*United States v. Mende*,
  43 F.3d 1298 (9th Cir. 1995) ........................................................27, 35

*United States v. Miller*,
  61 F.4th 426 (4th Cir. 2023) ...............................................................34

*Watec Co. v. Liu*,
  403 F.3d 645 (9th Cir. 2005) ........................................................43, 44

*West v. Bell Helicopter Textron, Inc.*,
  803 F.3d 56 (1st Cir. 2015) .................................................................24

*Zhang v. American Gem Seafoods, Inc.*,
  339 F.3d 1020 (9th Cir. 2003) ............................................................47

### FEDERAL AND STATE STATUTES

18 U.S.C. § 1836(c) ...................................................................................4

18 U.S.C. § 1839(3) ...............................................................14, 18, 23, 26

18 U.S.C. § 1839(3)(B) ....................................................................14, 22

28 U.S.C. § 1291 .......................................................................................4

**Page(s)**

28 U.S.C. § 1331 ...................................................................................4

Cal. Civ. Code § 3426.1 .......................................................................14

## OTHER AUTHORITIES

California Civil Jury Instructions (CACI) No. 4420 (2023) ...................................14

Fed. R. Evid. 403 ...........................................................................33, 35, 37

4 Roger M. Milgrim, *Milgrim on Trade Secrets* (2023).........................................54

## INTRODUCTION

XP Power LLC ("XP") is a global company that supplies power to critical systems in the healthcare, technology, and semiconductor fabrication industries. This case centers on the last industry, and in particular, XP's radio-frequency (RF) power business. RF power technology is used to manufacture semiconductors, which are the basic ingredients to every modern smartphone, tablet, and laptop. As XP expanded in the RF market, XP hired numerous experienced engineers, including three former employees of Comet Technologies USA, Inc. ("Comet").

Comet subsequently accused those employees and XP under the Defend Trade Secrets Act ("DTSA") of misappropriating five alleged trade secrets, which Comet designated Trade Secrets "T," "L," "S," "D," and "E." The district court awarded judgment to XP on Trade Secret T. The jury then found by special verdict that XP had not improperly acquired or used Trade Secret S, and that any improper acquisition or use of Trade Secret L was not a substantial factor in causing damages. The jury therefore awarded $0 in damages for both trade secrets. The jury found for Comet on Trade Secrets D and E, and awarded Comet $20 million in compensatory damages and $20 million in punitive damages. This appeal centers on Trade Secrets D and E.

While the RF power technology at issue in this case is complicated, the legal issues are straightforward.  The district court committed four fundamental errors warranting this Court's reversal and a new trial on liability and damages.

First, the district court improperly instructed the jury, over *both* parties' objections, on the elements of a trade secret.  Instead of instructing the jury that it was Comet's statutory burden to prove that the information alleged to be a trade secret was not "readily ascertainable by proper means," the court wrongly instructed that this was an "affirmative defense," on which *XP* bore the burden of proof.  1-ER-26.  "[P]lacing the burden of proof on the wrong party in a civil action generally constitutes reversible error."  *Carvalho v. Raybestos-Manhattan, Inc.*, 794 F.2d 454, 455 (9th Cir. 1986).  Accordingly, this Court should remand for a new trial on Trade Secrets D and E.

Second, the district court improperly excluded highly relevant evidence that directly refuted an essential element of Comet's claims.  During discovery, XP learned that one of the accused employees had taken information from a prior employer—Advanced Energy—and later used that information at Comet to develop alleged Trade Secrets D and E.  Yet the district court prevented XP from introducing evidence that Comet did not own some or all of alleged Trade Secrets D and E, because the technology had originated at and was taken from Advanced Energy.  This error severely prejudiced XP's ability to contest Comet's ownership of the trade

secrets at issue—a necessary element of DTSA claims. For this reason too, a new trial on Trade Secrets D and E is warranted.

Third, the district court improperly approved a damages verdict that has no basis in the evidence. Although Comet's own expert testified that the jury should award $6 million in damages for Trade Secret E and $4.9 million for Trade Secret D, the jury awarded $15 million and $5 million, respectively. Neither Comet, nor the district court, identified any proper evidentiary basis for awarding $15 million for Trade Secret E. Instead, Comet speculated, and the district court accepted, that the jury's $15 million award must have included damages for Trade Secrets L and S. But that is incompatible with the jury's special verdict, which expressly found that Comet suffered $0 in damages for those trade secrets. Additionally, neither Comet nor the district court identified any evidentiary basis for the jury's decision to round up from $4.9 million to $5 million for Trade Secret D. Accordingly, if this Court does not grant a new trial, it should order a remittitur to $10.9 million in compensatory damages for both trade secrets and a corresponding reduction in punitive damages to maintain the jury's 1:1 compensatory to punitive damages ratio.

Fourth, the district court improperly awarded double recovery to Comet. It is undisputed that XP never sold any RF products using Comet's trade secrets. Instead, the jury awarded compensatory damages on the theory that XP had avoided costs by using Comet's trade secrets to accelerate the launch of *future* products. But after the

3

jury awarded those damages, Comet sought and the district court granted a permanent injunction, preventing XP from ever selling any product designed using Comet's trade secrets. That injunction thus eviscerated the purported cost savings underlying the jury's verdict. Because the injunction and compensatory damages awards are duplicative and because it would be difficult now to undo the injunction and XP's substantial efforts to comply with it, this Court should vacate the damages award to prevent a double recovery.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). The district court entered an amended final judgment on March 22, 2023. 1-ER-6–7. On April 20, 2023, XP filed its notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). 2-ER-52–54. This Court has jurisdiction over appeals from the final decisions of district court pursuant to 28 U.S.C. § 1291.[1]

## STATEMENT OF THE ISSUES

(1) Whether the district court's failure to properly instruct the jury regarding the elements of a claim under the Defend Trade Secrets Act necessitates a new trial.

---

[1]   Although the district court styled its March 22, 2023 order as a "final judgment," the district court had not, in fact, ruled on Comet's motion for prejudgment interest. When the court rules on that outstanding motion, XP expects to file an amended notice of appeal. There is no prejudice from allowing the briefing on this appeal to proceed in the interim. *See, e.g.*, *Martinez v. Barr*, 941 F.3d 907, 915-16 (9th Cir. 2019).

(2) Whether the district court's erroneous and prejudicial exclusion of evidence material to whether Comet owned Trade Secrets D and E necessitates a new trial.

(3) Whether the jury's award of $20 million for Trade Secrets D and E necessitates a new trial or a remittitur to $10.9 million, the value that Comet told the jury to put down for those trade secrets. If so, whether punitive damages should also be reduced to $10.9 million to comport with constitutional requirements.

(4) Whether awarding damages and a permanent injunction for Trade Secrets D and E constitutes an impermissible double recovery.

## STATUTORY AUTHORITIES

The full text of the relevant statutory provisions are contained in this brief. *See* 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. XP Hired Former Comet Employees Whom, Unbeknownst To XP, Retained Comet Documents After Leaving Comet.

In an effort to build up its RF power business, XP hired numerous experienced engineers, including three former Comet employees: Doug Beuerman, Chris Mason, and Eiji Mori. Those engineers joined XP on February 12, 2018. *See* 4-ER-547 (Tr. 804:8-11). When joining, each signed a confidentiality agreement stating: "I will not, in connection with my employment by [XP], use or disclose to [XP] any

confidential, trade secret, or other proprietary information of any previous employer or other person to which I am not lawfully entitled." 9-ER-1712; 9-ER-1636; 9-ER-1715. Unbeknownst to XP, however, Mason and Beuerman retained certain Comet documents on their personal devices after leaving Comet.

### 2. Once Informed Of Comet's Concerns, XP Immediately Quarantined The Employees' Storage Devices.

A month later, XP learned from a third-party law firm that Comet had sued Beuerman for retaining confidential Comet materials. 4-ER-552 (Tr. 809:2-9). XP immediately discussed the allegations with Beuerman, analyzed its own systems to confirm there was no Comet information on them, and instructed Beuerman to hand over his external storage devices to a third-party forensics firm. 4-ER-553–54 (Tr. 810:11-811:3).

On May 17, 2018, Comet added Mason and Mori to its lawsuit. 4-ER-558 (Tr. 815:19-23). Again, XP instructed them to send their devices to a third-party forensics firm and both confirmed they had done so (including, in Mason's case, through sworn interrogatory responses). 4-ER-558–59 (Tr. 815:24-816:4); 2-ER-148–49.

### 3. Despite Initially Suing Only Its Former Employees, Comet Turned Its Sights On XP's Deeper Pockets.

Six months later, on November 2, 2018, Comet added XP to its lawsuit. 4-ER-559 (Tr. 816:9-10). Comet voluntarily dismissed that case on January 25, 2019. 4-ER-559 (Tr. 816:11-12).

Over eighteen months later, on September 11, 2020, Comet filed this suit against XP alone. 4-ER-567–68 (Tr. 824:23-825:1). Comet initially alleged that XP had misappropriated 20 trade secrets but the case went to trial on just five:

- Alleged Trade Secret D: Da Vinci RF Generator Control, Digital Measurement, and Software

- Alleged Trade Secret E: Next Generation RF Matching Network

- Alleged Trade Secret L: Kiyo Matching Network

- Alleged Trade Secret S: AMAT Matching Network

- Alleged Trade Secret T: Comet's Manufacturing, Sales, and Pricing

1-ER-22.

### B. Procedural Background

### 1. During Discovery, XP Learned That Mason Had Transferred Numerous Documents From Advanced Energy To Comet, Including Documents Alleged To Be Comet's Trade Secrets.

On or about June 29, 2021, XP learned through a deposition that—despite Mason's assurances that he had handed over all of his devices more than three years before—he had actually retained two devices with Comet documents. 4-ER-568–

7

69 (Tr. 825:24-826:1). "[W]ithin minutes of finding that out," XP's former CEO, Duncan Penny, confronted Mason and demanded he turn over the devices. 4-ER-569 (Tr. 826:3-7). After another week of denying their existence, Mason finally provided them to XP's counsel on July 6, 2021, and XP fired Mason the next day. 4-ER-569 (Tr. 826:3-18).

Through those drives, XP learned that Mason had also taken confidential material from a former employer to Comet. Specifically, while at Comet, Mason had stored or accessed thousands of confidential RF design documents he had improperly retained from his work at Advanced Energy—his employer before joining Comet. 7-ER-1213. XP anticipated presenting this evidence at trial to show that certain alleged Comet trade secrets were in fact created at Advanced Energy, and thus were not owned by Comet. XP also sought to amend its answer to add an unclean hands defense. *See* 7-ER-1212–14. The district court denied XP's motion to amend, however, concluding that Comet would be "severely prejudiced by the amendment at this stage of the proceedings." 6-ER-1135 (Dkt. 242).

At the same time, Comet filed a motion for summary judgment on unclean hands and a *Daubert* motion arguing that any evidence that *could* have been used to support an unclean hands defense, including expert testimony, should be excluded altogether. 6-ER-1104–05 (Dkt. 121, 125). XP strenuously objected, arguing that the "disputed [expert] opinions go beyond XP's unclean hands defense and are

pertinent to issues such as ownership" of the trade secrets. 7-ER-1191–92. For example, XP's technical expert, Dr. Joshua Phinney, explained how numerous Advanced Energy documents—which Mason had improperly downloaded and transferred to Comet—contained key components of what Comet alleged to be Trade Secrets D and E. *See* 7-ER-1197–207 (Phinney Sur-Reply ¶¶127-144). Dr. Phinney opined that these documents showed that Comet did not own core aspects of Trade Secret D (such as the "brainbug" design with a ███████████████████ ██████████████████) and Trade Secret E (such as the ██ sensor, tuning algorithms, and architecture). The district court nonetheless sided with Comet in granting both motions, excluding Dr. Phinney's testimony and others' going to this ownership issue. 2-ER-138–44; 1-ER-46.

Comet then filed a series of motions in limine (MIL), including two relevant here. MIL 4 sought to exclude "evidence of unclean hands and other withdrawn defenses," while MIL 5 sought to exclude "evidence of Trade Secret ownership by third parties." 2-ER-137. As to MIL 5, Comet argued that "XP should be precluded from arguing or eliciting any testimony suggesting that Comet's trade secrets are owned by any entity other than Comet, including … [that] Advanced Energy own[s] certain of the trade secrets." Mot. in Limine at 5 (Dkt. 262). The court granted MIL 4, but denied MIL 5, concluding that "evidence of Trade Secret ownership by third parties … is probative of an element to be tried." 2-ER-137.

> **2.  The District Court Barred XP From Using Evidence That Showed Comet's Purported Trade Secrets Were Owned By Advanced Energy.**

Despite denying MIL 5, the district court ultimately prohibited XP from introducing powerful evidence that Comet's purported trade secrets originated from Advanced Energy.

For instance, XP sought to introduce evidence that Comet did not own what Comet alleged to be a key element of Trade Secret E: the █ sensor design. *See, e.g.*, 3-ER-203–04, 3-ER-229 (Tr. 461:20-21, 462:18-22, 487:5-21).   This evidence included:

- Testimony from Mason that he developed the █ sensor while at Advanced Energy. *See* 7-ER-1188–89 (Mason Dep. 137:15-25, 263:3-17) (Q: ███████████████████████████████ ████████████████████████████████████ ████████████    *see also* 7-ER-1176–77.

- Mason's resume that he submitted to Comet, which showed that he developed the █ sensor while at Advanced Energy. 9-ER-1709–10 (stating that Mason ████████████████████ at Advanced Energy); *see also* 7-ER-1179.

- Testimony from Dr. Phinney, XP's technical expert, that Mason saved and accessed confidential documents he retained from Advanced Energy while working for Comet, including a file labeled "████████" 7-ER-1179 (citing 9-ER-1708).

Comet argued that XP should not be allowed to present such evidence because it related to XP's unclean hands defense.  *See* 9-ER-1446 (Tr. 230:9-11).  XP objected that the evidence "has nothing to do with unclean hands" and "has

everything to do with ownership, which [the court] noted was still an issue to be tried in [its] order denying Comet's MIL 5." 9-ER-1446 (Tr. 230:21-24); *see also* 5-ER-651 (Tr. 907:2-25).

Notwithstanding its prior ruling on MIL 5, the district court excluded this and other evidence related to Advanced Energy under Rule 403, concluding that it went "more to [XP's unclean hands] defense than to any other issue." 9-ER-1447–48 (Tr. 231:24-232:3); *see* 5-ER-652 (Tr. 908:2-3) (citing MIL 4). The court further held that, "to the extent that [the evidence was] relevant" for reasons other than unclean hands, its "probative value [was] substantially outweighed by the danger of confusion to the jury." 9-ER-1448 (Tr. 232:7-10).

XP also pointed during trial to additional evidence that it would have introduced to challenge Comet's purported ownership of Trade Secrets D and E. Among other things, XP submitted an offer of proof pointing to documents from Advanced Energy, found on Mason's computer, which contained key components of what Comet alleged to be its own trade secrets. *See* 7-ER-1174–83.

XP also pointed to testimony that would have bolstered its case that Comet's purported trade secrets originated at Advanced Energy, including letters from Advanced Energy accusing Mason and other Comet employees who previously worked at Advanced Energy of breaching their confidentiality obligations to Advanced Energy. *See* 7-ER-1177, 7-ER-1180–81; *see also* 2-ER-134 (excluding

testimony regarding these letters and citing MIL 4 Order and Rule 403). XP further cited testimony from Gary Russell, Director of Engineering Match Networks at Comet, that Mason had showed him a program called "AE Designer"; that Mason later developed a program called "Comet Designer"; and that Russell "never compared" the two to ensure Mason had designed the latter from scratch. 7-ER-1177–79 (citing Russell deposition); *see also* 2-ER-134 (excluding this testimony).

### 3. Comet Sought Unjust Enrichment Damages Based On Allegedly Avoided Development Costs For Future Products.

Comet's damages expert, James Malackowski, argued that Comet was entitled to unjust enrichment damages.[2] Because XP had not sold any competing RF products using Comet's alleged trade secrets, Malackowski argued that unjust enrichment must be measured in terms of the "cost that [XP] saved," not the profits it had made. 4-ER-432 (Tr. 689:4-13).

Malackowski testified that Comet's research and development costs could serve as a proxy for XP's unjust enrichment. 4-ER-434 (Tr. 691:13-15). Accordingly, Malackowski relied on engineer time billed to specific "project codes" "related to [each] trade secret[]" to calculate the research and development (R&D) costs for the "technical" trade secrets (D, E, L, and S), while making certain upward

---

[2] Malackowski advanced two alternative theories of damages in this case: unjust enrichment and reasonable royalty. The jury awarded damages based only on Comet's unjust enrichment theory. 2-ER-122.

and downward adjustments. 4-ER-436–41, 4-ER-467–68, 4-ER-472–73 (Tr. 693:6-698:4, 724:19-725:10, 729:18-730:11).

Based on that process, Malackowski calculated the following damages, which Comet's counsel urged the jury to "put down" on its special verdict form: $6 million for Trade Secret E, $4.9 million for Trade Secret D, $11.1 million for Trade Secret L, and $10.5 million for Trade Secret S. 6-ER-1082 (Tr. 1337:4-7). Summing all these together produced a total damages figure of $32.5 million. 6-ER-1082 (Tr. 1337:15).

### 4. The District Court Awarded XP Judgment On Trade Secret T.

After Comet completed its trial presentation, XP moved for judgment as a matter of law, which the district court granted as to Trade Secret T. *See* 4-ER-500–01 (Tr. 757:9-758:9). The Court stated that Comet had not identified the trade secret with "[]sufficient specificity" and that Malackowski's valuation analysis for that trade secret was "so bad that no reasonable juror could find that there was a valuation that they could use." 4-ER-500–01 (Tr. 757:19-758:5); 4-ER-501 (Tr. 758:2) (describing it as a "fantasy analysis").

### 5. The District Court Improperly Instructed The Jury, Converting An Element Of Comet's Claims Into An Affirmative Defense, Over Both Parties' Objections.

The DTSA requires a plaintiff to plead and prove the existence of a trade secret—one key element of which is that the allegedly secret information must not

be "readily ascertainable through proper means, by another person." 18 U.S.C. § 1839(3)(B). But the district court's instructions identified this element as an "AFFIRMATIVE DEFENSE," and instructed the jury that XP "did not misappropriate a Comet trade secret *if XP proves* by a preponderance of evidence that the trade secret information … was readily ascertainable by proper means." 1-ER-26–27.

XP objected to this instruction, explaining the likely origin of the district court's confusion. Comet had originally asserted misappropriation claims under both the DTSA and the California Uniform Trade Secrets Act ("CUTSA"). *See* 2-ER-154-58. Under the CUTSA, the requirement that information not be readily ascertainable is an affirmative defense, while under the DTSA, it is a substantive element. *See* 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1; California Civil Jury Instructions (CACI) No. 4420 (2023). During the trial, however, Comet voluntarily dismissed its CUTSA claims with prejudice. 2-ER-124. In light of that dismissal, XP informed the court that the proposed instruction was erroneous. 2-ER-130–31. XP proposed eliminating the words "'Affirmative Defense'" and revising the instruction to state that "XP did not misappropriate a Comet trade secret *unless Comet* proves that the trade secret information allegedly used or disclosed by XP was *not* readily ascertainable by proper means." 2-ER-131 (emphasis added).

Comet also acknowledged that "[i]nformation being readily ascertainable by proper means is not an affirmative defense under the DTSA; it is an element of proving of a trade secret." 2-ER-133. Comet likewise conceded that "Instruction No. 20[] incorrectly suggests that 'readily ascertainable information' is an affirmative defense under the DTSA, which it is not." *Id.* Comet therefore objected to the instruction as "likely to cause confusion and risking a jury verdict that is inconsistent with federal law." *Id.* Comet's proposed solution was to remove Instruction 20 entirely. *See id.*

The district court adopted neither party's proposal and made no other effort to fix the error that had been brought to its attention. Instead, the court issued an Order stating without explanation that both parties' objections were "Overruled." 1-ER-36–37. The court delivered Instruction 20 as written. *See* 1-ER-26–27.

### 6. The Jury Awarded More Damages For Trade Secrets D And E Than The Evidence Supported.

On March 23, 2022, the jury entered a special verdict. For Trade Secret S, the jury found there had been no misappropriation because XP did not "acquire or use the information by improper means." 2-ER-121. For Trade Secret L, the jury found that XP had acquired or used information by improper means but that "XP's improper acquisition or use of the information" was not a "substantial factor in causing any damages for misappropriation of the information." *Id.* Accordingly, the jury found damages from Trade Secrets S and L to be "$0." 2-ER-122.

15

For Trade Secrets D and E, the jury found XP liable for misappropriation and awarded $5.0 million in damages for Trade Secret D and $15.0 million for Trade Secret E, *id.*—numbers that do not match any figures presented to the jury.

Finally, the jury awarded $20 million in punitive damages, a 1:1 ratio with its compensatory damages award.

### 7. The District Court Entered Duplicative Relief In The Form Of A Permanent Injunction.

After the trial, Comet moved for injunctive relief to bar XP from selling any products designed using Trade Secrets D, E, L, and S, and from retaining those trade secrets. *See* 6-ER-1133 (Dkt. 409). XP objected on several grounds, including that the injunction would constitute double recovery. *See* 7-ER-1153–69. XP explained that the jury had awarded Comet unjust enrichment damages on Trade Secrets D and E based on Comet's theory that XP had saved costs by using those trade secrets to develop competing RF products to be "introduced in the future." 7-ER-1156–57 (quoting 4-ER-432 (Tr. 689:4-13)). An injunction prohibiting XP from selling products based on those trade secrets would eliminate that alleged head start, amounting to double recovery.

The district court rejected this argument and entered a permanent injunction as to Trade Secrets D, E, and L,[3] prohibiting XP from "possessing, accessing, reviewing, using, or disclosing Comet's Trade Secret Information"; "making, offering to sell, selling, or otherwise distributing anywhere in the world any product derived from Comet's Trade Secret Information"; and "advertising, promoting, offering to sell, selling, or otherwise providing services anywhere in the world using or claiming the benefit of Comet's Trade Secret Information." 1-ER-13–14. The district court also required XP to hire a third-party vendor to quarantine and remove all Comet trade secret information, giving Comet the right to twice-a-year audits. 1-ER-14–16.

### 8.    The District Court Denied XP's Post-Trial Motions.

XP filed a motion to alter or amend judgment or for a new trial on damages, arguing that the jury's $5 million and $15 million award for Trade Secrets D and E were incompatible with the evidence, which supported awards of at most $4.9 million and $6 million, respectively. 2-ER-101–07. Comet opposed, arguing that the jury's $15 million award for Trade Secret E should be understood to encompass damages for the misappropriation of earlier alleged trade secrets—Trade Secrets S and L. 2-ER-73–81. According to Comet, by misappropriating Trade Secret E, XP

---

[3]    The court denied the injunction as to Trade Secret S because the jury found XP had not acquired or used that trade secret through improper means. *See* 1-ER-8–9.

had "avoided the years of development and associated costs for Trade Secrets S and L that led up to, and were necessary for, development of Trade Secret E." 2-ER-65.

The Court endorsed this theory, asserting that the jury's $15 million award "confirms that it credited the evidence on the iterative nature of the development of Comet's trade secrets, and that Trade Secret E would not have been possible without the earlier work on Trade Secrets S and L." 1-ER-4. The Court did not address the jury's award for Trade Secret D at all, nor address Comet's suggestion that the jury was permitted to round-up damages to the nearest million. *See id.*

XP also argued that the permanent injunction and compensatory damages awards constituted double recovery. 2-ER-107–12. The district court disagreed, concluding that the damages were meant to compensate Comet for "past harm," not "future harm." 1-ER-5 (citation omitted).

## SUMMARY OF ARGUMENT

The district court made a series of errors during and after trial that warrant reversal.

*First*, the district court erroneously instructed the jury over *both* parties' objections. Under the DTSA, a plaintiff must prove as an element of a trade secret that the secret information was not "readily ascertainable by proper means." 18 U.S.C. § 1839(3). The district court, however, instructed the jury that this was an affirmative defense—reversing the burden of proof. Comet cannot meet its burden

of showing that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed," as it must in order to avoid a new trial. *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citation omitted). This Court has repeatedly recognized that such errors require reversal because the burden of proof "affects all aspects of the jury's verdict" and because "it is impossible to determine whether the erroneous burden of proof was outcome determinative." *Carvalho*, 794 F.2d at 455.

*Second*, the district court erroneously excluded substantial evidence that refuted Comet's claimed ownership of Trade Secrets D and E. In particular, XP sought to introduce evidence that numerous components of those trade secrets—including the ████ design of the "brainbug" and the █ sensor—were developed at Advanced Energy and taken by Mason to Comet. Despite the fact that this evidence was highly probative of a disputed element of Comet's claim, the district court excluded it, citing its prior unclean-hands ruling and concerns about juror confusion. That exclusion was erroneous. And Comet cannot rebut the presumption of prejudice that accompanies the error because the evidence went to a core component of Comet's claims. *See Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005).

*Third*, the jury's damages award is unsupported by the evidence. Despite the fact that Comet's own damages expert testified that Trade Secret E cost only $6

million to develop, the jury awarded $15 million. This award has no basis in the evidence. Nor can it be defended on the theory that the jury was awarding damages for Trade Secrets L and S. That cannot be squared with the jury's actual verdict, which expressly found that (1) XP did *not* acquire or use the information associated with Trade Secret S by improper means, and (2) any use of Trade Secret L was not a substantial factor in causing damages. The jury's decision to round up damages for Trade Secret D by $100,000 also lacks any basis in the evidence. The district court thus should have ordered a new trial or remittitur and correspondingly reduced punitive damages to retain the jury's 1:1 ratio.

*Fourth*, the district court erred in awarding a double recovery. Because XP never sold any products leveraging Comet's trade secrets, Comet did not and could not claim it suffered damages in the form of lost sales or market share. Instead, Comet sought to recover under an unjust enrichment theory based on the costs XP allegedly avoided while developing *future* products. But the district court's permanent injunction wiped out that purported benefit. Under the injunction, XP is barred from "making, offering to sell, selling, or otherwise distributing anywhere in the world any product derived from Comet's Trade Secret Information." 1-ER-13. Accordingly, any time XP spent building upon Comet's trade secrets is time wasted, not time saved. Because the permanent injunction and compensatory damages awards provide duplicative remedies and XP has already expended significant

20

resources—that cannot be recouped—complying with the injunction, this Court should set aside the damages verdict to avoid providing Comet with a windfall.

## STANDARD OF REVIEW

This Court reviews de novo whether a jury instruction misstated the law. *See Clem*, 566 F.3d at 1180; *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005).

This Court reviews evidentiary rulings for abuse of discretion. *Obrey*, 400 F.3d at 694. A district court's improper exclusion of evidence is presumed to have prejudiced the appellant, a presumption that can only be overcome by "showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted." *Id.* at 701.

This Court reviews the denial of a motion for a new trial on damages or remittitur for abuse of discretion—but where the district court's rationale for upholding damages "is obviously not tethered to the law or the facts of the case," or "'when it makes an error of law,'" the district court has abused its discretion. *Henry v. Lehman Com. Paper, Inc. (In re First All. Mortg. Co.)*, 471 F.3d 977, 1003 (9th Cir. 2006) (citation omitted).

This Court reviews a district court's choice of remedies for abuse of discretion. *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020). An award of double recovery constitutes an abuse of discretion. *Teutscher v. Woodson*, 835 F.3d 936, 953-56 (9th Cir. 2016).

21

## ARGUMENT

## I. THE DISTRICT COURT'S ERRONEOUS REVERSAL OF THE BURDEN OF PROOF IN ITS FINAL JURY INSTRUCTIONS NECESSITATES REVERSAL.

The district court erroneously flipped the burden of proof for a key element of a trade secret. Rather than properly instruct the jury that Comet must prove that its alleged trade secrets "derive[d] independent economic value … from not being generally known … [or] readily ascertainable through proper means," 18 U.S.C. § 1839(3)(B), the district court labeled the "readily ascertainable" element an "affirmative defense" and placed the burden of proof on XP. 1-ER-26–27. "An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005)). And "placing the burden of proof on the wrong party in a civil action," as the court did here, "generally constitutes reversible error." *Carvalho v. Raybestos-Manhattan*, 794 F.2d 454, 455 (9th Cir. 1986).

### A. The Instruction Erroneously Reversed The Burden of Proof, Despite XP's Timely Objection.

The DTSA requires a plaintiff to plead and prove that the allegedly secret information is not "readily ascertainable through proper means." 18 U.S.C. § 1839(3)(B); *see InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). But Jury Instruction 20 flipped that burden. In bold, all-capital text,

22

Instruction 20 described "INFORMATION READILY ASCERTAINABLE BY PROPER MEANS" as an "AFFIRMATIVE DEFENSE," and stated that XP "did not misappropriate a Comet trade secret *if XP proves* by a preponderance of evidence that the trade secret information … was readily ascertainable by proper means." 1-ER-26–27 (emphasis added). In other words, the instruction transformed a core element of a DTSA claim into an affirmative defense.

That was unequivocally wrong: Ample authority makes clear that the plaintiff bears the burden of proving the non-ascertainability element of a DTSA claim, as Comet itself acknowledged below. *See* 18 U.S.C. § 1839(3); 2-ER-133 (Comet explaining that "Instruction No. 20[] incorrectly suggests that 'readily ascertainable information' is an affirmative defense under the DTSA, which it is not.").[4]

## B. The Erroneous Instruction Necessitates Reversal.

"An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem*, 566 F.3d at 1182 (quoting *Dang*, 422 F.3d at 811). Once this Court finds instructional error, it will "presume prejudice," *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1243 (9th

---

[4] *See also Medimpact Healthcare Sys., Inc. v. IQVIA Holdings Inc.*, No. 19cv1865, 2022 WL 1571000, at *6 (S.D. Cal. May 17, 2022) (non-ascertainability is an "element[] that Plaintiffs must prove at trial," not an "affirmative defense"); *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 17-cv-01095, 2020 WL 5797974, at *4 (M.D. Tenn. Sept. 29, 2020) (granting summary judgment to defendants because "*Plaintiffs* have failed to establish the information is 'not readily ascertainable through proper means.'" (emphasis added)).

Cir. 2021), shifting the burden to the opposing party to "demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Clem*, 566 F.3d at 1182 (quoting *Dang*, 422 F.3d at 811).

Comet cannot meet that burden. Courts "have consistently recognized that placing the burden of proof on the wrong party in a civil action generally constitutes reversible error." *Carvalho*, 794 F.2d at 455; *see also Boles Trucking, Inc. v. United States*, 77 F.3d 236, 241 (8th Cir. 1996) ("[I]t is reversible error to place the burden of proof on the wrong party …."); *West v. Bell Helicopter Textron, Inc.*, 803 F.3d 56, 69 (1st Cir. 2015) ("[P]lac[ing] the burden of proof on the wrong party" amounted to an "error of law [that] necessarily constituted an abuse of discretion."). In so holding, "courts have emphasized that the burden of proof affects all aspects of the jury's verdict and that it is impossible to determine whether the erroneous burden of proof was outcome determinative." *Carvalho*, 794 F.2d at 455.

Indeed, this Court recently identified two scenarios that are each "sufficient to find prejudice": (1) "'[W]hen the trial court erroneously adds an extra element to the plaintiff's burden of proof, it is unlikely that the error would be harmless,'" and (2) "'prejudice is also generally more likely than not if nothing about the jury's verdict indicates that the result would have been the same without the error.'" *BladeRoom Grp.*, 20 F.4th at 1245 (citations omitted). Here, both those considerations weigh against Comet.

24

First, as contemplated in *Bladeroom*, the trial court altered the elements that the plaintiff was required to prove. Here, of course, instead of adding an additional element to the plaintiff's burden of proof, it *removed* an element from the plaintiff's burden of proof, and added it to the defendant's. If anything, however, that is even more problematic than the mirror-image scenario contemplated in *Bladeroom* because the jury was not even required to find that the plaintiff affirmatively proved each element necessary to sustain its liability verdict. That alone severely undermines any attempt by Comet to prove that the error was harmless. *See, e.g.*, *Clem*, 566 F.3d at 1182.

Second, "there is no way to know whether the jury would [have] return[ed] the same answers if the district court" had not erred. *BladeRoom Grp.*, 20 F.4th at 1244-45. As this Court acknowledged in *Carvalho*, courts have found that because "[b]urden of proof affects all aspects of the jury's verdict, … it is impossible to determine whether the erroneous burden of proof was outcome determinative." 794 F.2d at 455. The same is true here, necessitating a new trial on Trade Secrets D and E.

Moreover, XP elicited substantial testimony at trial that Comet's trade secrets were readily ascertainable. XP's technical expert, Dr. Phinney, testified that Comet's alleged trade secrets could be readily ascertained through various means, including by opening a match box and reviewing public patents. For instance, Dr.

Phinney testified that he opened an Advanced Energy match box and identified a sensor closely mirroring Comet's allegedly "secret" sensor. *See* 5-ER-741–42 (Tr. 997:4-998:8). When a defendant submits evidence that competing companies use similar designs, which "are evident from the [products] themselves," the alleged trade secrets are considered "'readily ascertainable through proper means.'" *Kellwood Apparel, LLC v. Protrend Ltd.*, No. CV 20-214, 2020 WL 13302669, at *8 (C.D. Cal. Mar. 5, 2020) (quoting 18 U.S.C. § 1839(3)).

Dr. Phinney also testified that public patents disclosed to persons "in the field" many of Comet's alleged trade secrets, as well "a typical implementation" of them. *See* 5-ER-751–54 (Tr. 1007:2-1010:5) (describing patents disclosing the use of a system-on-a-chip architecture and field programmable gate arrays). As other courts have explained, "[i]nformation in published patents or patent applications is readily ascertainable by proper means," and is thus not a trade secret. *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 707 (Fed. Cir. 2021) (collecting cases). Relatedly, Comet's own Director of Engineering Match Networks, Gary Russell, admitted on cross-examination that Comet had presented on various aspects of the alleged trade secrets at trade shows. *See, e.g.*, 9-ER-1492–93 (Tr. 276:8-277:20) (diagram of the Gen-2 Match Network Control System); 9-ER-1493–94 (Tr. 277:24-278:10) (diagram of Gen-3 Match Control showing field programmable gate array controls and brainbug).

To be sure, Comet introduced contrary evidence, and the jury ultimately found that the information was not readily ascertainable. *See* 8-ER-1424, 8-ER-1428 (Tr. 209:8-19, 213:1-10); 9-ER-1514 (Tr. 298:4-20); 2-ER-120. But "nothing about the jury's verdict indicates that the result would have been the same without the error," *i.e.*, had the burden correctly been placed on Comet instead of XP. *BladeRoom Grp.*, 20 F.4th at 1245 (citation omitted); *see also Dang*, 422 F.3d at 811-12. Because "no party can demonstrate" what the jury would have found under the proper burden of proof, Comet "cannot refute the presumption of prejudice" and a new trial is warranted. *BladeRoom Grp.*, 20 F.4th at 1245.

## II. THE DISTRICT COURT IMPROPERLY EXCLUDED EVIDENCE RELEVANT TO OWNERSHIP OF TRADE SECRETS D AND E.

The jury's liability and damages findings with respect to Trade Secret D and E were further contaminated by the district court's improper exclusion of evidence demonstrating that Comet did not own key aspects of each trade secret.

As this Court has explained, "[e]xclusion of relevant evidence pursuant to Rule 403 is 'an extraordinary remedy to be used sparingly.'" *Gametech Int'l Inc. v. Trend Gaming Sys., L.L.C.*, 232 F. App'x 676, 678 (9th Cir. 2007) (quoting *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995)). Accordingly, although this Court reviews a district court's evidentiary rulings for abuse of discretion, *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005), it has not hesitated to grant a new trial

where a district court improperly excluded relevant evidence.[5]  Indeed, a district court's improper exclusion of relevant evidence is *presumed* to have prejudiced the appellant.  *Id.* at 701.  That presumption can be overcome only by "showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted."  *Id.*  Where, as here, a district court improperly excludes multiple pieces of evidence, the Court considers the "cumulative[]" prejudicial impact of those errors.  *Jerden v. Amstutz*, 430 F.3d 1231, 1240 (9th Cir. 2006).

### A. The District Court Improperly Excluded Evidence That Comet Did Not Own Key Components Of Trade Secrets D And E.

The district court abused its discretion by preventing XP from introducing evidence that Comet did not own significant aspects of Trade Secrets D and E.

**1.** Starting with Trade Secret E, XP was barred from presenting evidence that Advanced Energy, not Comet, owned a key component of Trade Secret E: ███ sensor.  6-ER-1020–22 (Tr. 1275:24-1277:17).  Sensors are an important component of any RF matching network.  They "sense the condition of the plasma" and provide measurements to the control unit, which allows the control unit to react to changes

---

[5]  *See, e.g.*, *Pac. Nw. Solar, LLC v. Northwestern Corp.*, Nos. 22-35186, 22-35224, 2023 WL 2945314, at *1-2 (9th Cir. Apr. 14, 2023); *Aguilar v. City of Los Angeles*, 853 F. App'x 92, 97-98 (9th Cir. 2021); *January v. Dr Pepper Snapple Grp., Inc.*, 594 F. App'x 907, 910 (9th Cir. 2014); *Gametech Int'l*, 232 F. App'x at 678; *Obrey*, 400 F.3d at 697-99; *Jerden v. Amstutz*, 430 F.3d 1231, 1241 (9th Cir. 2006).

in the plasma within milliseconds of those changes occurring. 8-ER-1343–45 (Tr. 128:15-130:19). This constant measurement and reaction is essential to producing quality wafers, which are the building blocks of semiconductors. 8-ER-1345 (Tr. 130:1-19). At trial, Comet argued that its ▪ sensor design involved "a unique, new method for controlling the sensor output making it as accurate as possible." 3-ER-204 (Tr. 462:18-22).

Comet contended that Mason had stolen the ▪ sensor design from Comet and referenced it while designing XP's RF power products. *See, e.g.*, 3-ER-203-04, 3-ER-229 (Tr. 461:20, 462:18-22, 487:5-21). The ▪ sensor was Comet's core example of XP's alleged "access" or "use" of Trade Secret E—indeed, it was the *only* example that Comet's counsel highlighted during closing argument. 6-ER-1020–22 (Tr. 1275:24-1277:17).

To rebut those allegations, XP sought to introduce evidence that Comet could not own the ▪ sensor because that design had been used by Mason at Advanced Energy long before Mason ever worked for Comet. This evidence included (1) testimony from Mason that he had used the ▪ sensor while at Advanced Energy, *see* 7-ER-1188–89 (Mason Dep. 137:15-25, 263:3-17); (2) Mason's resume, which showed that he developed the ▪ sensor while at Advanced Energy, *see* 9-ER-1708–10; and (3) testimony from XP's experts that Mason had saved and accessed confidential documents he retained from Advanced Energy while working for

29

Comet, including a file labeled "████████" *see* 9-ER-1708; 7-ER-1209–11; 7-ER-1202–04 (Phinney Sur-Reply ¶¶137-38); 7-ER-1176–77, 7-ER-1179–81 (discussing this evidence).

Beyond the ██ sensor, XP also sought to introduce other evidence that Advanced Energy, not Comet, owned other key components of Trade Secret E. *See* 7-ER-1197–207 (Phinney Sur-Reply ¶¶127-44). For instance, Comet argued that XP had misappropriated its secret method of switching between two different tuning algorithms using ████████ 3-ER-269–72 (Tr. 527:23-530:17). But that same process was disclosed in two Advanced Energy documents that Mason took from his former employer (Advanced Energy) to Comet. *See* 9-ER-1679–80 (███████████ ████████████████████████████████████████████████); 9-ER-1644 (████████████████████████████████████████████ ████████████████████████████); *see also* 7-ER-1197–98 (Phinney Sur-Reply ¶129) (discussing this evidence). In addition, XP sought to introduce schematics showing that an Advanced Energy match box exhibited similar architecture to Comet's match box. *See* 9-ER-1681–707; *see also* 7-ER-1201, 7-ER-1207 (Phinney Sur-Reply ¶¶133, 143); 7-ER-1181. And XP likewise sought to introduce an internal Advanced Energy handbook retained by Mason after transferring to Comet that described similar ideas regarding architecture, direct tuning, common platform, and capacitor and motor characteristics as those that

30

Comet later claimed were part of Trade Secret E. *See* 9-ER-1640–41; 9-ER-1644–49; 9-ER-1653; *see also* 7-ER-1199–1201, 7-ER-1204–07 (Phinney Sur-Reply ¶¶130-31, 133, 139-44); 7-ER-1181.

XP sought to introduce similar evidence with respect to Trade Secret D. Comet's trial presentation for Trade Secret D focused on what it called the "brainbug," which ███████████████████████████████. *See, e.g.*, 8-ER-1397 (Tr. 182:15-25). Comet's "brainbug" had several components, including a ████████████████████████████████████████████ *See, e.g.*, 8-ER-1352 (Tr. 137:6-15); 3-ER-221, 3-ER-231 (Tr. 479:21-24, 489:18-21); 5-ER-745 (Tr. 1001:5-15). ██████████████████████████████ are well-known concepts that have been used in the industry for years. 4-ER-580 (Tr. 837:20-21) (██████ design used for two decades); 5-ER-716 (Tr. 972:1-17) (██████ used since the 1980s); 5-ER-745 (Tr. 1001:16-19) (████ architecture used for over a decade). Yet despite their common usage, Comet argued that XP had stolen the ███████████ ████████████ concepts embodied in its "brain bug." 3-ER-212 (Tr. 470:8-16); 3-ER-231, 3-ER-238 (Tr. 489:16-24, 496:6-11). To rebut that allegation, XP sought to introduce evidence showing that Advanced Energy had used these same concepts in designing its products and that Mason had retained documents detailing these concepts when transferring from Advanced Energy to Comet. *See* 9-ER-1640–44; 9-ER-1687–89; *see also* 7-ER-1199–200, 7-ER-1202 (Phinney Sur-Reply ¶¶131-32,

31

136); 7-ER-1181. For example, an internal Advanced Energy report showed a



9-ER-1675; *see also* 9-ER-1640–41

(████████████████████████████████████); 7-ER-1199–

200 (Phinney Sur-Reply ¶131) (discussing this evidence). Another Advanced

Energy handbook disclosed an RF match using ████████ — ████████

9-ER-1642; 5-ER-764 (Tr. 1020:19-22); *see also* 7-ER-1199–200 (Phinney

Sur-Reply ¶131) (discussing this evidence).

    **2.** Despite its obvious relevance, the district court excluded all of this

evidence. Prior to trial, the court excluded portions of three of XP's expert reports

discussing Advanced Energy evidence, finding them irrelevant because the court had

previously excluded XP's unclean hands defense. *See* 1-ER-46 (excluding portions

of Drs. Phinney's, Cowen's, and Spencer's sur-reply reports); *see also* 7-ER-1195

(Comet arguing for exclusion on basis of relevance). Although XP had argued that

this evidence went to the issue of ownership (not just unclean hands), the district

court ignored that argument. *See* 7-ER-1191–92; 1-ER-46.

    Later at trial, the court prohibited XP from introducing Advanced Energy

evidence related to the █ sensor under Rule 403, which permits "[t]he court [to]

exclude relevant evidence if its probative value is substantially outweighed by a

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see* 9-ER-1447–48 (Tr. 231:24-232:13); 5-ER-652 (Tr. 908:2-3). The district court again reasoned that this evidence went "more to [XP's unclean hands] defense than to any other issue." 9-ER-1448 (Tr. 232:2-3) (excluding Mason's deposition testimony); *see* 5-ER-652 (Tr. 908:2-3) (excluding Phinney's testimony and Mason's resume). And because the district court had prohibited XP from making an unclean hands defense, the court treated the evidence's relevance as low or essentially non-existent. The court added that, "to the extent [the evidence was] relevant," its "probative value [was] substantially outweighed by the danger of confusion to the jury." 9-ER-1448 (Tr. 232:7-10).

**3.** The district court erred in both its analysis of relevance and its Rule 403 balancing. As XP explained, it sought to present this evidence not to support an unclean hands defense, but to show that Comet could not prove "ownership, which [the district court had previously] noted was still an issue to be tried in [its] order denying Comet's MIL 5." 9-ER-1446 (Tr. 230:21-24); *see also* 7-ER-1191–92; 2-ER-137 (court denying Comet's motion to "[e]xclud[e] evidence of Trade Secret ownership by third parties" because such evidence "is probative of an element to be tried"). Nevertheless, the district court excluded precisely what it had earlier said

33

should not be—evidence showing that a third party (Advanced Energy), rather than Comet, owned key components of Trade Secrets D and E.

The district court erred in excluding this evidence. Evidence that "goes directly to [an] element[] of the offense" is "highly probative." *United States v. Miller*, 61 F.4th 426, 431 (4th Cir. 2023) (district court's improper exclusion of such evidence was an abuse of discretion); *see United States v. Bryan*, 719 F. App'x 695, 696 (9th Cir. 2018) (emphasizing the "significant probative value" of evidence going to a "disputed . . . element"). Here, the Advanced Energy evidence went directly to the question of whether Comet owned elements of Trade Secrets D and E. And ownership is a key element of a DTSA claim. *See* 1-ER-22 ("To succeed on its claim, Comet must prove . . . [t]hat Comet owned" the alleged trade secrets). Yet the district court gave little or "no consideration to the probative value of [the evidence], a crucial element of the balancing test that Rule 403 requires." *United States v. McFall*, 558 F.3d 951, 963 (9th Cir. 2009).

That error infected the district court's balancing and its consideration of the potential for juror confusion. Had the district court "recognized that [the] evidence [was] probative of an element" of Comet's claim, it would have (or should have) realized that "'the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.'" *United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015) (citation omitted). Instead, because the district court

treated the evidence's probative value as low, it excluded the evidence on a remarkably thin and entirely hypothetical concern of juror confusion. 9-ER-1448 (Tr. 232:7-10).

As XP explained, there was very little danger of juror confusion. Because the district court had prohibited XP from making an unclean hands argument *before* trial, XP never presented that defense to the jury. *See* 9-ER-1447 (Tr. 231:8-12). There was thus no reason to believe that the jurors would have become confused by a defense XP was "not arguing" and that would "never see the light day." *Id.* And even if such a concern were valid, the district court could have easily addressed it through a limiting instruction explaining that the evidence was relevant to ownership alone. *See, e.g., Mende*, 43 F.3d at 1302 (such instructions can "minimize[]" prejudice and "we must presume that juries will follow" them). The district court's rationale for excluding the evidence therefore cannot be justified.

Nor can Comet justify the exclusion on the basis that it would cause "unfair prejudice" to Comet. Fed. R. Evid. 403. In the Rule 403 context, "'unfair prejudice' means that the evidence not only has a significant impact on the defendant's case, … but that its admission results in some unfairness to the defendant *because of its non-probative aspect*." *United States v. Bailleaux*, 685 F.2d 1105, 1111 n.2 (9th Cir. 1982) (emphasis added) (citation omitted). Here, any harm to Comet's case would

35

have been due to the evidence's high probativeness to defeating Comet's claim of ownership. Accordingly, the district court erred in excluding the evidence.

Other courts have found error under similar circumstances. For example, the Fourth Circuit held that a district court "abused its discretion and acted arbitrarily in excluding, on [a] wholesale basis," evidence that many of the alleged trade secrets in a case had been made public through prior litigation. *E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 564 F. App'x 710, 712, 715 (4th Cir. 2014) (per curiam). The Fourth Circuit disagreed with the district court's conclusion that such evidence was "irrelevant or insufficiently probative," because the evidence went to whether the alleged trade secrets met "the elements of a protectable trade secret." *Id.* at 713-15. Acknowledging the "*possibility* of juror confusion and perhaps delay," the Fourth Circuit emphasized that "exclusion on that basis is only proper when the probative value of the evidence is *substantially outweighed* by the danger of confusion." *Id.* at 715. And there, it plainly was not. *See id.* ("When a district court conducts a Rule 403 balancing exercise, ordinarily it should 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" (citation omitted)). Accordingly, the Fourth Circuit remanded for a new trial.

The same result is warranted here: any miniscule danger of juror confusion based on a defense that was never presented cannot "substantially outweigh[]" the

probative value of the evidence in rebutting a core element of Comet's claims. Fed. R. Evid. 403.

### B. Comet Cannot Rebut The Presumption of Prejudice.

Under Ninth Circuit precedent, the improper exclusion of evidence is presumed to prejudice the appellant, and Comet cannot rebut that presumption by showing that it is "more probable than not that the jury would have reached the same verdict even if the evidence had been admitted." *Obrey*, 400 F.3d at 701.

Starting with Trade Secret E, the ▮ sensor was key to Comet's trial presentation, and the central example at closing by which it argued XP had "access[ed]" or "used" Trade Secret E. *See* 6-ER-1020–22 (Tr. 1275:24-1277:17).

Throughout the trial, Comet's attorneys and witnesses repeatedly hammered the argument that Mason had taken the ▮ sensor block diagram and used it at XP. *See* 3-ER-212 (Tr. 470:9-11) ("It's the same sensor again."); 3-ER-226 (Tr. 484:2-5) ("[T]here is the sensor block diagram again."); 6-ER-1021 (Tr. 1276:10) ("Were [the sensor files] used throughout the years? Of course they were."). Comet's technical expert, Stanley Shanfield, told the jury that he was "shocked" to see Comet information, including Comet's "proprietary sensor block diagram, the trade secret block diagram," "on an XP slide." 3-ER-203 (Tr. 461:15-24). He stated that it "would be a red flag for anybody in the industry" if an engineer claimed to "complete … a ▮ sensor design" in the time that Mason did. 3-ER-200–01 (Tr. 458:10-459:3);

*see also* 3-ER-274–75 (Tr. 532:25-533:10 (discussing email from Beuerman to Mori at XP regarding "Chris[ Mason]'s ██████ sensor"). And he opined that XP had used Comet's sensor design in its designs for new RF match products. *See* 3-ER-275 (Tr. 533:14-19) ("[T]hey don't change it. … They have the same diagram, same idea, and basically the same way to get the accuracy that Comet had determined years back.").

At closing argument, Comet's attorney zeroed in on the ██ sensor design files. 6-ER-1020–22 (Tr. 1275:24-1277:17). Counsel emphasized that these files were highly "valuable" and had been "used throughout the years" by XP. 6-ER-1021–22 (Tr. 1276:10, 1277:9-10). Indeed, the ██ sensor was the *only* example of XP access or use that Comet's counsel highlighted for Trade Secret E. *See* 6-ER-1020–22 (1275:24-1277:17). As such, had XP been able to introduce evidence that Comet did not own the ██ sensor, Comet cannot show it is more probable than not that the jury would have found that Comet owned Trade Secret E or that XP had accessed or used it.

XP was also prejudiced by being prevented from presenting evidence that Comet did not own other components of Trade Secret E. For example, had XP been able to present the Advanced Energy report and handbook Mason retained after transferring to Comet, XP could have successfully shown that ████████████ ████████████████████████████████████ ideas that Comet claimed were

part of Trade Secret E had been previously used by Advanced Energy. *See* 9-ER-1640–41; 9-ER-1644–49; 9-ER-1653; 9-ER-1675; 9-ER-1679–80; *see also* 7-ER-1199–201, 7-ER-1204–07 (Phinney Sur-Reply ¶¶130-31, 133, 139-44); 7-ER-1181. Again, Comet cannot show it is "more probable than not" that it would have prevailed had XP cast serious doubt on Comet's ownership of these components of Trade Secret E. Accordingly, this Court should grant a new trial as to Trade Secret E.

The same follows for Trade Secret D. At closing argument, Comet's counsel highlighted the "█████████████" controller with its "██████" design as a core component of Trade Secret D. 6-ER-1024 (Tr. 1279:3-18). And throughout the trial, Comet's counsel focused heavily on the similarities between XP's designs and Comet's products, because both used a "█████████████" architecture and ██████. 3-ER-212, 3-ER-238 (Tr. 470:9-16, 496:6-11). But XP was precluded from showing that Mason had taken documents describing those same ideas from Advanced Energy to Comet, undermining Comet's claims of ownership. Because Comet cannot rebut the presumption that XP was prejudiced by the exclusion of such evidence, a new trial is warranted for Trade Secret D as well.

Finally, the excluded evidence also had a significant impact on Comet's damages analysis. Comet's unjust enrichment theory was premised on totaling work associated with "project codes" that were in turn associated with the alleged trade

secrets. Because XP's evidence would have shown that key components of Trade Secret D and E, like the "brainbug" architecture and ▮ sensor, were not owned by Comet, it would also have proven that Comet could not recover for misappropriation of major components of Trade Secrets D and E. To the extent Comet argues that anything remained of those trade secrets, Comet did not present evidence that would have allowed the jury to excise the cost associated with components owned by Advanced Energy from the cost associated with the remainder (if any). As a result, remittitur is not feasible, and, at a minimum, a new trial on damages would be required.

## III. THE DISTRICT COURT'S DENIAL OF XP'S MOTION FOR A NEW TRIAL OR REMITTITUR CANNOT BE SQUARED WITH COMET'S OWN TRIAL EVIDENCE OR THE JURY'S SPECIAL VERDICT.

The district court also erred by denying XP's motion for a new trial or remittitur as to the damages award for Trade Secrets D and E. The jury's compensatory damages award is incompatible with the evidence presented at trial. Although Comet's damages expert testified that Trade Secret E unjustly enriched XP in the amount of $6 million, the jury awarded $15 million for that trade secret. Similarly, the jury appears to have rounded up damages for Trade Secret D (from $4.9 million to $5 million), with no reasonable basis for that decision.[6]

---

[6] The actual costs that Comet's expert calculated that XP avoided amounted to $4,883,630 for Trade Secret D and $5,992,807 for Trade Secret E. For ease of discussion, those numbers are referred to throughout this brief as $4.9 million and

### A. The Jury's Compensatory Damages Award Was Clearly Not Supported By The Evidence, And Was Arbitrary And Speculative.

A new trial or remittitur is warranted where damages are "clearly not supported by the evidence, or only based on speculation or guesswork." *Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Loc. No. 287*, 175 F.3d 680, 689 (9th Cir. 1999) (citation omitted); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 824 (9th Cir. 2001); *Henry v. Lehman Com. Paper, Inc. (In re First All. Mortg. Co.)*, 471 F.3d 977, 1001 (9th Cir. 2006) (reversing district court's denial of new trial or remittitur). That is the case here.

#### 1. Comet's Evidence Does Not Support The Jury's $20 Million Award.

No evidence before the trial court could have supported either the $15 million award for Trade Secret E or the $5 million award for Trade Secret D.

As explained above, Comet's damages expert, Mr. Malackowski, asserted that unjust enrichment must be measured in terms of the "cost that [XP] saved" by the alleged misappropriation. 4-ER-432 (Tr. 689:4-13). To determine XP's saved costs, Malackowski used Comet's own research and development costs for each technical trade secret as a proxy, 4-ER-434 (Tr. 691:13-15), ultimately arriving at a total cost

---

$6 million respectively. But should Comet accept remittitur, it should be required to accept the damages calculated by its expert.

savings of $4.9 million for Trade Secret D and $6 million for Trade Secret E, as shown in the following chart provided by Comet:



6-ER-1088. In Malackowski's opinion, "this [was] the amount that Comet spent that XP didn't have to; they saved." 4-ER-440 (Tr. 697:11-15). In keeping with this testimony, Comet argued in closing that the jury should "put down … [$]4.9 million for D [and] [$]6 million for E" for compensatory damages. 6-ER-1082 (Tr. 1337:4-7).

### 2. The Jury Awarded An Amount Far Exceeding Anything Supported By The Trial Evidence.

The jury, however, did not award the $4.9 and $6 million requested by Comet and calculated by Comet's expert. Nor did it award the significantly lower amounts calculated by XP's own damages expert. 6-ER-930–31 (Tr. 1185:7-1186:2). Instead, in a special verdict separately addressing each alleged trade secret, the jury found that XP was liable for unjust enrichment damages in the amount of $5 million

42

for Trade Secret D and $15 million for Trade Secret E. 2-ER-122. It did so despite finding that XP did not acquire or use Trade Secret S through improper means, and that any improper use or acquisition of Trade Secret L was not a substantial factor in causing damages. 2-ER-121.

The jury's award was clearly unsupported by the evidence. Beginning with Trade Secret E, there is no evidentiary support for the jury's award of $15 million, which far exceeds the $6 million that Comet's expert (generously) calculated and that Comet's counsel argued Comet had spent in developing Trade Secret E. Unsurprisingly, Comet has never pointed to any evidence corresponding to a $15 million award—and no such evidence exists—nor was $15 million ever discussed by either side as a potential measure of damages for Trade Secret E.

Because no evidence presented supported the jury's $15 million award, a remittitur to "the maximum amount sustainable by the proof" (or, at Comet's election, a new trial on damages) is necessary. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (citation omitted). Indeed, this Court has approved of remittitur in strikingly similar circumstances. In *Watec Co. v. Liu*, for example, the Court concluded that a jury's "$5 million trademark infringement damages award was 'not supported by, and in fact completely ignores and rejects, the evidence,' since the figure calculated by the damage experts was only $2,156,590." 403 F.3d 645, 655 (9th Cir. 2005) (quoting district court; and citing *Seymour v.*

43

*Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987)).  Where, as here, "the jury's damages award 'far exceed[s] the amount proved at trial'" and is not obviously the product of passion or prejudice, "use of remittitur [i]s appropriate." *Id.* (quoting *Seymour*, 809 F.2d at 1387).

Similar flaws are reflected in the jury's $5 million compensatory damages award for Trade Secret D.  As noted, Comet's expert had calculated $4.9 million in saved costs for Trade Secret D, and Comet's counsel correspondingly asked the jury to "put down" that amount.  6-ER-1082 (Tr. 1337:4-7).  But the jury increased that figure by $100,000 with no obvious reason beyond a preference for an even million-dollar amount.  *See* 2-ER-122.  Indeed, in the district court, Comet did not meaningfully dispute that this number reflected anything other than the jury rounding up.  *See* 2-ER-77.  In short, the jury's $100,000 addition is "clearly not supported by the evidence," or at best was "only based on speculation or guesswork," *Snyder*, 175 F.3d at 689 (citation omitted).  Accordingly, remittitur is warranted.

### C.  The District Court's Reasons For Rejecting XP's Motion For Remittitur Do Not Withstand Scrutiny.

The district court's reasons for denying XP's motion do not hold up.  The district court wholly failed to address the $100,000 addition that the jury made for Trade Secret D, ignoring XP's objections entirely.  *See* 1-ER-3–4.  As to Trade Secret E, the district court accepted Comet's argument that the $15 million should be understood to have included damages for Comet's acquisition or use of two

44

*earlier* alleged trade secrets—Trade Secrets S and L. *See id.* The district court's acceptance of that theory cannot be squared with the evidence or the jury's determination that XP did not misappropriate Trade Secret S and that any "improper acquisition or use" of Trade Secret L was not a "substantial factor in causing any damages." 2-ER-121.

At trial, Comet's expert had argued that XP had avoided $4.9 million in costs by misappropriating Trade Secret D and $6 million by misappropriating Trade Secret E. 2-ER-70 (chart summarizing analysis); 6-ER-1088 (same). He also suggested, however, that Trade Secret E built upon the R&D that went into the "earlier" Trade Secrets L and S. *See, e.g.*, 4-ER-441 (Tr. 698:10-13). As a result, he theorized that if the jury found that XP had misappropriated Trade Secret E, it could find that XP was unjustly enriched by the distinct costs to Comet of developing not only Trade Secret E, but also Trade Secrets L, S, and D—for a total award of $32.5 million. 4-ER-440–41 (Tr. 697:24-698:13). In post-trial briefing, Comet argued that the jury credited this testimony and "inclu[ded] at least a portion of those costs (from Trade Secrets S and L)" in its compensatory damages award. 6-ER-1142 (Dkt. 526 at 1). The district court agreed, concluding that the award "confirms that [the jury] credited the evidence on the iterative nature of the development of Comet's trade secrets, and that Trade Secret E would not have been possible without the earlier work on Trade Secrets S and L." 1-ER-4.

45

The trouble with this theory is that it cannot be squared with the jury's special verdict, which expressly *rejected* the notion that XP had improperly benefited from Trade Secrets L and S, and found that the amount of XP's "unjust enrichment" in relation to those two alleged trade secrets was "$0." 2-ER-121–22. In particular, the jury found that XP did not "acquire or use the information" in Trade Secret S "by improper means" at all. 2-ER-121. And as for Trade Secret L, the jury found that any "improper acquisition or use of the information" was not "a substantial factor in causing *any* damages." *Id.* (emphasis added). Thus, as the court itself elsewhere acknowledged, "the jury found that the improper use or acquisition of Trade Secret L *had not caused damages at the time of the verdict.*" 1-ER-9 (emphasis added). Having expressly determined that XP was not unjustly enriched with regard to Trade Secrets L and S, the maximum damages supported by Comet's evidence was $10.9 million.



6-ER-1088 (annotated).

The court's determination that the jury must have included an award of $9 million for Trade Secrets L and S—above and beyond the $6 million that Comet's expert testified was attributable to Trade Secret E itself—is incompatible with and would negate the jury's special verdict. Interpreting the jury to have rendered an inconsistent verdict and then upholding it was neither appropriate nor permissible. *Cf. Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1037 (9th Cir. 2003) (noting that "[i]n the case of a special verdict, inconsistencies are problematic and require a new trial … if they arise between two or more factual findings"); *Hatami v. Kia Motors Am., Inc.*, No. SACV 08-226, 2010 WL 11475044, at *4 (C.D. Cal. July 7, 2010) ("[T]he jury made specific factual findings on the special verdict form, and the Court cannot disregard them. The theory that the jury could have written down a damages number on the Special Verdict Form that they didn't really mean … is in effect disregarding the jury's factual finding, which is impermissible." (citation omitted)).

Although XP raised these arguments below, the district court did not explain how its interpretation of the jury's $15 million award for Trade Secret E was reconcilable with the jury's special verdict on Trade Secrets L and S. Nor did the district court (or Comet itself) ever explain how the jury could have derived the particular figure it awarded. Although the district court noted that Comet's damages

47

expert testified that Trade Secret E could include "everything," that was, in Comet's telling, $32.5 million. 4-ER-441 (Tr. 698:10-13); 1-ER-4. But the jury awarded $15 million—a number divorced from any piece of evidence, and which neither the district court nor Comet has attempted to defend on its own terms.

Instead, the district court asserted that "even assuming that [the jury] did give Comet more than it asked for, there is no per se statutory cap on the amount of damages per trade secret one can receive." 1-ER-4. But that is a red herring. The issue is not that the jury's award exceeded a statutory "cap," *id.*; rather, it is that the award must be supported by the evidence. *See, e.g.*, *Snyder*, 175 F.3d at 689. But the jury's verdict for Trade Secret E cannot be reconciled with the evidence, the parties' presentations, or the remainder of the jury's special verdict. As this Court previously explained in reversing a district court's denial of a motion for remittitur, where the "district court bent over backwards to find a potentially valid basis in the record for the jury verdict, but that rationale is obviously not tethered to the law or the facts of the case," the judgment must be reversed in part and remanded for a proper calculation of damages. *In re First All. Mortg. Co.*, 471 F.3d at 1003. That result is required here.

**D.** **Because The Jury's Compensatory Damages Award Must Be Reduced, The Jury's Punitive Damages Award Must Be Reduced As Well.**

In its special verdict, the jury awarded a total of $20 million in compensatory damages and an additional $20 million in punitive damages. Reducing the punitive damages award so that it is no greater than the compensatory damages award is necessary to (1) give effect to the jury's decision to award punitive damages in a 1:1 ratio with compensatory damages[7]; (2) respect constitutional limits on the availability of punitive damages; and (3) ensure consistency with what other courts have determined is the highest permissible punitive damages ratio in cases involving the DTSA where compensatory damages are awarded based on the defendant's purported benefit rather than on harm to the plaintiff. *See, e.g.*, *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425-26 (2003) (explaining that a ratio of punitive damages "equal to compensatory damages" can "reach the outermost limit of the due process guarantee" when compensatory damages are substantial, and finding that $1 million in damages is substantial); *Payne v. Jones*, 711 F.3d 85, 103 (2d Cir. 2013) ($60,000 compensatory damages award is substantial); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1143, 1145 (7th Cir. 2020) (reducing punitive damages to a 1:1 ratio with "unjust

---

[7]    In awarding an identical amount of punitive damages to compensatory damages, the jury rejected Comet's insistence that "no reasonable jury could award less than … two times compensatory damages." 6-ER-977 (Tr. 1232:16-17).

enrichment" damages, and noting that if actual harm damages were used it "would in turn drastically change the relevant ratio").[8]

Comet acknowledged below that if the jury's compensatory damages award is found to be excessive, then "Comet should be given the choice between remittitur and a new trial" on punitive damages. 6-ER-1142 (Dkt. 526 at 15). The parties thus appear to agree that if the Court finds that the compensatory damages awarded to Comet are excessive, the Court should vacate and remand the punitive damages award to allow for a proportional reduction via remittitur, or a new trial on punitive damages.

\* \* \*

Accordingly, this Court should vacate the jury's damages award with instructions to the district court to either (1) order a remittitur to $6 million in compensatory damages for Trade Secret E, $4.9 million for Trade Secret D, and $10.9 million in punitive damages, or (2) at Comet's election, order a new trial limited to compensatory damages on Trade Secrets D and E and punitive damages.

---

[8] *See also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ.211, 2021 WL 1553926, at \*11 (S.D.N.Y. Apr. 20, 2021) (granting remittitur of punitive damages because a "1:1 ratio relative to the compensatory award is the highest permissible award" when compensatory damages were "calculated based on [the defendant's] benefit" and a comparison to "actual loss" damages would result in a much higher ratio), *aff'd in part and rev'd in part on other grounds*, 68 F.4th 792 (2d Cir. 2023).

## IV. THE DISTRICT COURT IMPROPERLY ALLOWED DOUBLE RECOVERY.

The jury awarded Comet unjust enrichment damages on the theory that XP had obtained an unfair head start towards developing future products on the basis of Comet's trade secrets. The district court, however, proceeded to enjoin XP from developing and selling those products. Because the injunction comprehensively precludes XP from benefiting from its purported misappropriation, and nullifies its purported head start, XP no longer can be said to have been "enriched" by that alleged misappropriation.

As other courts have recognized, to award both damages and an injunction in such a case would amount to affording the plaintiff an impermissible double recovery. As such, this Court must vacate one award. And because XP has already expended substantial and unrecoverable resources complying with the injunction, this Court should vacate the damages award.[9]

### A. The Law Prohibits Double Recovery.

It "goes without saying that the courts can and should preclude double recovery." *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 333 (1980). Double recovery occurs when a court awards both damages and an injunction covering the same harm. The "animating principle" behind the

---

[9] XP does not object to the injunction as applied to Trade Secret L, because the jury did not grant unjust enrichment damages for that trade secret.

prohibition against double recovery "is simple: when a plaintiff seeks compensation for wrongs committed against him, he should be made whole for his injuries, not enriched." *Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016) (citation omitted); *see id.* (plaintiff should not receive a "windfall"). Thus, for example, an award of front pay and an injunction ordering an employer to reinstate a wrongfully discharged employee constitute double recovery because they provide duplicative relief for the same harm. *Id.* at 953-56.

The same principle applies in the trade secrets context. In fact, the Second Circuit recently applied this principle to reverse a district court's award of unjust enrichment damages in a case that closely resembles this one. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023). The district court in *Syntel* had entered both "an unjust enrichment award of avoided costs" *and* a permanent injunction preventing the defendant from using the plaintiff's trade secrets. *Id.* at 811. Because the "permanent injunction ended [the defendant's] use of [the plaintiff's] trade secrets, and, therefore, its ability to profit from any avoided costs," the Second Circuit concluded that these remedies were duplicative. *Id.* Thus, the plaintiff was "not entitled to avoided costs as a form of unjust enrichment damages." *Id.* In so holding, the Second Circuit emphasized that the defendant had "never developed or sold a competing software product using [the plaintiff's] trade secrets." *Id.* at 812.

Other courts have reached similar conclusions. For example, the Nebraska Supreme Court previously vacated a reasonable royalty award on the ground that "it is impermissible double recovery for a court to award damages for future use and, at the same time, issue a permanent injunction barring such use." *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 784 (Neb. 2001). The Fifth Circuit also held that where the plaintiff recovered damages for "'future lost profits,'" an injunction preventing the defendant from "using, transferring, or disclosing the trade secrets" would be "'duplicative.'" *Next Level Commc'ns LP v. DSC Commc'ns Corp.*, 179 F.3d 244, 247, 252 (5th Cir. 1999) (quoting the district court); *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 328 (5th Cir. 1997) (affirming district court's denial of injunctive relief). The Sixth Circuit too has concluded that where a plaintiff has already been "adequately compensated" through the jury's unjust enrichment award and the plaintiff has "not suffer[ed] lost sales as a result of the misappropriation," no permanent injunction is warranted. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 404-05 (6th Cir. 2013); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 805 F.3d 701, 706-08 (6th Cir. 2015) (describing the prior holding).

This case law is also consistent with the leading treatise on trade secrets. That treatise warns plaintiffs that measuring an unjust enrichment award "by the value of the misappropriated trade secret ... may preclude an award of injunctive relief on the

theory that having received the full value of its trade secret, the owner is not entitled to further relief."  4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.02 (2023) (citing *Allied Erecting & Dismantling*, 805 F.3d at 706).

### B.    The Jury's Award Of Unjust Enrichment Damages And The Court's Permanent Injunction Constitute Double Recovery.

The district court awarded double recovery.   The jury awarded Comet compensatory damages on the theory that XP was unjustly enriched by using Comet's trade secrets to obtain a head start toward developing and selling new products "*in the future*."  4-ER-432 (Tr. 689:10-13) (emphasis added).  But the court's permanent injunction eliminated that benefit by barring XP from using or selling any products developed using Comet's trade secrets.  To give Comet both remedies is to compensate it twice for the same harm.

The testimony of Comet's damages expert, Mr. Malackowski, underscores this point.  Malackowski opined that misappropriation of technical trade secrets can give rise to "one of two different categories" of damages.  4-ER-432 (Tr. 689:6-7). The first is the "profits that the defendant made" by selling competing products.  4-ER-432 (Tr. 689:7-8).   The second is "the cost that [the defendant] saved by misappropriating the trade secrets rather than conducting the R&D [itself]."  4-ER-432 (Tr. 689:8-10).  Because XP had never sold any competing products using Comet's trade secrets, Comet did not seek the first category of damages.  *See id.* at 4-ER-460–61 (Tr. 717:23-718:2) ( "No actual lost sales.").  Instead, Malackowski

"focused on th[e] second" category: "the cost that was saved by XP as a result of using the Comet trade secrets." 4-ER-432 (Tr. 689:10-13); *see* 4-ER-440 (Tr. 697:13-15) (damages are "the amount that Comet spent that XP didn't have to" or what XP "saved"). The jury ultimately awarded Comet damages on that basis.

But the district court's injunction nullified those savings. The injunction bars XP from "using" Trade Secrets D and E, and from selling any product that is "derived from" those trade secrets. 1-ER-13–14. Instead, XP must do its "own research and development to make its own products." 1-ER-12. XP can thus no longer "leverag[e]" Comet's trade secrets to "leapfrog[]" the competition and "get ahead of Comet." 4-ER-440 (Tr. 697:11-21); *see also* 4-ER-480 (Tr. 737:5-11) (similar). Simply put, the injunction eliminates the "value" of the trade secrets as described by Comet, which is that they afforded XP a head start that "would allow [XP] to bring new products to market that customers were looking for." 4-ER-429 (Tr. 686:18-23).

Every benefit to XP that Malackowski identified is negated by the injunction. For instance, Malackowski testified that XP would be able to use Comet's trade secrets to "offer[] [customers] the same thing" as Comet, resulting in Comet losing market share and the "halo effect of being an innovator in the industry." 4-ER-432–33, 4-ER-461 (Tr. 689:19-690:4, 718:3-10). But the injunction prohibits XP from "making, offering to sell, selling, or otherwise distributing anywhere in the world

any product derived from Comet's Trade Secret Information," or "advertising, promoting, offering to sell, selling, or otherwise providing services anywhere in the world using or claiming the benefit of Comet's Trade Secret Information." 1-ER-13–14. Malackowski further testified that XP retained the option to search through Comet's trade-secret library to develop future products. 4-ER-475 (Tr. 732:11-14). But the injunction prohibits XP from "possessing, accessing, reviewing, using, or disclosing Comet's Trade Secret Information" and requires XP to engage a third-party forensic company to "remove from their possession and quarantine any information associated with Trade Secrets D, E and L." 1-ER-13–14. Finally, Comet has never suggested that any damages are warranted because XP "diminish[ed], much less destroy[ed], the secrets' continued commercial value to [Comet]" by, say, publicly disclosing the trade secrets. *Syntel*, 68 F.4th at 811. Therefore, there is no need for damages beyond the injunction. Because the damages and injunction are duplicative, this Court should set aside one.

Given that XP has already expended significant and unrecoverable costs to comply with the injunction, this Court should vacate the damages award. In *Syntel*, the Second Circuit held that the district court's entry of a permanent injunction rendered the jury's prior unjust enrichment award unavailable. *Id.* at 814. Here, having chosen an injunction that eliminated the purported unjust enrichment to XP, Comet should not be heard to complain that it has undermined the basis for the jury's

damages verdict.  *See Home Pride*, 634 N.W.2d at 784 (reversing duplicative damages award for "future use" because "Home Pride requested, and was given, a permanent injunction" "barring such use").  At minimum, however, the injunction and damages rulings should not both be permitted to stand.

### C.  The District Court's And Comet's Arguments To The Contrary Are Unpersuasive.

The district court declined to vacate the injunction or damages on the ground that "the damages awarded by the jury compensated for past harm," while the injunction compensated for "future harm."  1-ER-5 (citation omitted).  In the district court's view, the jury's damages award "did not address ongoing or future harm from the future development of XP products based on Comet trade secrets."  *Id.* (citation omitted).

But that analysis cannot be squared with the facts.  Comet's own expert explained that unjust enrichment damages would compensate XP for "the cost that [it] saved" in expediting the development of products "to be introduced *in the future*."  4-ER-432 (Tr. 689:10-13) (emphasis added); *see* 6-ER-974–75 (Tr. 1229:22-1230:1) (claiming XP was unjustly enriched by using Comet's trade secrets "to develop new next generation" products).

And whether classified as a past or future harm, the fundamental point is the same: both the injunction and damages are predicated on preventing or compensating for *the same harm*—XP's accelerated launch of products using

57

Comet's trade secrets. Given the injunction, XP no longer can launch any competing product using Comet's trade secrets. The unjust enrichment damages thus no longer compensate Comet for any benefit XP retains.

In its opposition to XP's motion to amend the judgment or for a new trial, Comet cited three cases that it believed justified the issuance of both awards, but all of those cases just underscore the same basic point: while courts can issue damages and injunctive relief in the same case to remedy different harms, they cannot award duplicative remedies. *See* 6-ER-1142 (Dkt. 526 at 19-20). Below, Comet principally relied on the district court's decision in *Syntel*, which Comet characterized as "directly applicable here" and as issuing a permanent injunction "similar to the proposed injunction requested by Comet here." 2-ER-116–17. But *Syntel* was subsequently *reversed* by the Second Circuit, whose decision strongly favors XP's position. *See* 68 F.4th at 811-14. The second of Comet's cases—*Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 16cv545, 2018 WL 6272893 (E.D. Va. Nov. 30, 2018)—likewise supports XP. That court *rejected* the plaintiff's motion for a permanent injunction on the ground that the plaintiff had already been compensated for "future use" through a reasonable royalty award. *Id.* at *4-7.

That just leaves Comet with its third case: *ClearOne Communication, Inc. v. Bowers*, 643 F.3d 735 (10th Cir. 2011). But *ClearOne* is plainly distinguishable because the monetary damages in that case compensated for the defendant's lost

profits, not avoided costs related to a not-yet-introduced product. In *ClearOne*, the defendant had misappropriated trade secrets to "create a [competing] algorithm and related software product," which it had placed "on the market," entering into licensing agreements with a former client of the plaintiff's and undercutting the plaintiff's prices. *Id.* at 743. Because the plaintiff had suffered a real economic loss, an injunction prohibiting future use of the trade secrets did not compensate the plaintiff for all of its past economic harms. But here, Comet has suffered no past harms because XP never sold any products derived from the alleged trade secrets, as Comet's own damages expert conceded, and cannot otherwise use or retain the trade secrets. *See* 4-ER-460–61 (Tr. 717:23-718:2) ("No actual lost sales."). Accordingly, *ClearOne* does not help Comet.

* * *

In short, the injunction and compensatory damages awards provide Comet with twice the recovery for a single harm. Both, therefore, cannot stand. Because XP has already expended significant unrecoverable resources complying with the injunction, this Court should vacate the compensatory damages award. If this Court does so, it should also remand for a new trial on punitive damages to avoid creating a significant "disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award," where the jury originally chose a 1:1 ratio. *State Farm*, 538 U.S. at 418.

## CONCLUSION

For these reasons, the judgment of the district court should be reversed.

Dated: August 30, 2023

Respectfully submitted,

*s/* Michael E. Bern

Patricia Young
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Michael E. Bern
   *Counsel of Record*
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

August 30, 2023

(202) 637-2200

*Counsel for Defendant-Appellant XP Power LLC*

## STATEMENT OF RELATED CASES

Appellant is unaware of any cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-15601, 15709 _____

I am an attorney for Defendant-Appellant XP Power, LLC.

This brief contains 13,890 words, including 83 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[x] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Michael E. Bern* _____      **Date** August 30, 2023 _____